**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| **W.M. BARR & COMPANY, INC.,**<br>Plaintiff,<br><br>v.<br><br>**GENUINE PRODUCTS SUPPLY LLC,**<br>Defendant. | Case No. 2:26-cv-3566<br><br>**COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff W.M. Barr & Company, Inc. d/b/a Barr Brands ("Barr Brands" or "Plaintiff"), by and through its undersigned counsel, brings this action against Defendant Genuine Products Supply LLC ("G.P.S." or "Defendant") for trademark infringement under 15 U.S.C. § 1114, unfair competition and false designation of origin under 15 U.S.C. § 1125(a)(1)(A), tortious interference with contracts and business relationships under Tennessee common law, and inducement to breach a contract under Tenn. Code § 47-50-109. G.P.S. sells products bearing Barr Brands's trademarks through online marketplaces without the quality controls and, for covered products, the satisfaction guarantee accompanying genuine Barr Brands products. These differences are material and likely to confuse consumers. Barr Brands alleges the following based on its knowledge as to its own acts and business and, as to other matters, upon information and belief.

## PARTIES JURISDICTION AND VENUE

1. Plaintiff W.M. Barr & Company, Inc. is a corporation organized under the laws of Tennessee, with its principal place of business in Memphis, Tennessee.

2. Upon information and belief, Defendant Genuine Products Supply LLC is a limited liability company organized under the laws of New York, with its principal place of business in

Monroe, New York, in Orange County. G.P.S. conducts business using the addresses 4 Kerestier Ct., Unit 206, Monroe, New York 10950; 3 Meron Dr., Unit 301, Monroe, New York 10950; and 197 Stone School House Rd., Bloomingburg, NY 12721.

3. Upon information and belief, G.P.S. operates the Amazon storefront "G.P.S." under merchant ID A1KGK42RKCGLZP[1]; the eBay storefront "g.p.s.llc,"[2]; and the Walmart storefront associated with seller ID 16256[3] (collectively, the "G.P.S. Storefronts").

## JURISDICTION

4. This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367. Barr Brands's federal claims are predicated on 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a) and (c), and its claims arising under the laws of the State of Tennessee are substantially related to its federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

5. This Court has personal jurisdiction over G.P.S. because it has expressly aimed tortious activities toward the State of Tennessee and established sufficient minimum contacts with Tennessee by, among other things, advertising and selling infringing products bearing Barr Brands's trademarks to consumers within Tennessee through a highly interactive commercial website, through the regular course of business, with the knowledge that Barr Brands is located in Tennessee and is harmed in Tennessee as a result of G.P.S.'s sales of infringing products to Tennessee residents. G.P.S. knows that Barr Brands is located in Tennessee, among other reasons, because it received a cease-and-desist letter informing them that Barr Brands is located in

[1] Accessible at: https://www.amazon.com/sp?seller=A1KGK42RKCGLZP (last accessed 10/29/26).
[2] Accessible at: https://www.ebay.com/usr/g.p.s.llc/ (last accessed 10/29/26).
[3] Accessible at: https://www.walmart.com/global/seller/16256 (last accessed 10/29/26).

Tennessee and is harmed in Tennessee by its unlawful actions. Barr Brands's claims arise out of G.P.S.'s sales of infringing products bearing Barr Brands's trademarks to Tennessee residents through the regular course of business.

6. G.P.S. continues to engage in these actions despite being put on notice of its illegal conduct and the impendency of this action.

## VENUE

7. Venue is properly founded in this judicial district pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the claims herein occurred within this judicial district.

## FACTUAL ALLEGATIONS

### Barr Brands & Its Trademarks

8. Barr Brands markets and sells high-quality solvents, thinners, removers, cleaners, and automotive products, including, but not limited to, products under the Aircraft®, Bulldog®, Goof Off®, Klean Strip®, Naked Gun®, and Prep-All®, brand names.

9. Barr Brands allows its products to be purchased by end-user consumers in the United States only from sellers who are expressly authorized by Barr Brands to sell Barr Brands products ("Authorized Sellers").

10. Barr Brands permits Authorized Sellers to sell Barr Brands products in approved channels only and requires Authorized Sellers to abide by agreements, policies, and other rules that impose requirements relating to quality controls, customer service, and other sales practices (collectively, the "Barr Brands Rules").

11. Barr Brands devotes a significant amount of time, energy, and resources toward protecting the value of its brands, products, name, and reputation. By allowing end-user consumers to purchase Barr Brands products only from Authorized Sellers who are required to

follow the quality controls and other requirements in the Barr Brands Rules, Barr Brands ensures that consumers receive products that are subject to its quality controls and maintains the integrity and reputation of the Barr Brands family of brands. In the highly competitive automotive chemical solutions and maintenance products market, quality and customer service are a fundamental part of a consumer's decision to purchase a product.

12. To promote and protect the Barr Brands-owned brands, Barr Brands has registered numerous trademarks with the United States Patent and Trademark Office, including but not limited to: AIRCRAFT® (U.S. Trademark Reg. No. 3,526,540); Bulldog® (U.S. Trademark Reg. No. 6,701,964); BULLDOG® (U.S. Trademark Reg. No. 3,053,118); GOOF OFF® (U.S. Trademark Reg. No. 4,604,030); GOOF OFF THE ULTIMATE REMOVER!® (U.S. Trademark Reg. No. 2,834,601); KLEAN-STRIP® (U.S. Trademark Reg. Nos. 1,659,325 & 2,943,879); KLEAN STRIP GREEN® (U.S. Trademark Reg. No. 5,030,090); NAKED GUN® (U.S. Trademark Reg. No. 3,448,661); and PREP-ALL® (U.S. Trademark Reg. No. 3,844,684). (collectively the "Barr Brands Trademarks").

13. The registration for each of the Barr Brands Trademarks is valid, subsisting, and in full force and effect.

14. Barr Brands actively uses, advertises, and markets the Barr Brands Trademarks in commerce.

15. Consumers recognize the Barr Brands Trademarks as being associated with high-quality products.

16. Due to the quality and exclusive distribution of Barr Brands's products, and because Barr Brands is recognized as the source of high-quality products, the Barr Brands Trademarks have enormous value.

**Online Marketplaces and the Challenge They Present to Barr Brands Product Quality**

17. E-commerce retail sales have exploded over the past decade. From 2009 through the second quarter of 2026, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.8% to 17.1%. *Compare Quarterly Retail E-Commerce Sales Report*, UNITED STATES CENSUS BUREAU (February 16, 2010), https://www.census.gov/retail/ecommerce.html, *with*, *Quarterly Retail E-Commerce Sales Report*, UNITED STATES CENSUS BUREAU (February 16, 2010), https://www2.census.gov/retail/releases/historical/ecomm/09q4.pdf.

18. In 2025, consumers spent $1.234 trillion on e-commerce sales, a 5.4% increase from 2024. *See* Abbas Haleem, *2025 U.S. Ecommerce Sales Mark Fourth Straight Year of Single-Digit Growth*, DIGITAL COMMERCE 360 (Apr. 7, 2026), https://www.digitalcommerce360.com/article/us-ecommerce-sales/. The massive growth in e-commerce is being driven largely by sales on online marketplaces. For example, in 2024, United States consumers spent more than $500 billion in ecommerce sales on Amazon and Walmart. *See* Abbas Haleem, *US Ecommerce Sales in 2024 More Than Double Those of 2019*, DIGITAL COMMERCE 360 (Mar. 3, 2025), https://www.digitalcommerce360.com/2025/03/03/us-ecommerce-sales-2024/.

19. While online marketplaces have created a great deal of opportunity, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

20. Unlike when purchasing products at a brick-and-mortar store, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them. Instead, consumers must trust that the product they receive from an online order will be of the quality they expect and typically receive from the brand owner.

21. Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller, and do not require sellers to actually have the products they sell in their possession or inventory. As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

22. Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) brand owners who exercise quality controls over their products sold by authorized sellers.

23. Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no ability to exercise their quality controls over products sold by unauthorized sellers or to ensure the products are safe and authentic. A brand owner's inability to exercise control over the quality of its products can present serious risks to the health and safety of consumers.

24. The structure, construction, and user interface of online marketplaces also pose threats to a brand owner's ability to maintain its goodwill, reputation, and brand integrity.

25. When purchasing products on an online marketplace, customers are confused about whether a seller of a product is authorized by the brand owner. Additionally, the interface design of many online marketplaces causes consumers to falsely believe that they are always purchasing from the brand owner or, at minimum, from an authorized seller that is selling under the brand owner's oversight and with the brand owner's approval.

26. For all of these reasons, a vast number of consumers purchase products on online

marketplaces without recognizing that they purchased from a seller who is not authorized or otherwise affiliated with the brand, and does not (and cannot) follow the brand owner's quality controls.

27. When a consumer purchases on an online marketplace and receives a product that is damaged, defective, poor quality, or otherwise not as described, the consumer is much more likely to associate the problem with the brand/manufacturer rather than the product seller.

28. Online marketplaces also give disgruntled customers a powerful and convenient forum to air their grievances about problem products: online product reviews. Any consumer who is dissatisfied with a product received can post a review on the marketplace for all other consumers across the world to see. These reviews, which often remain permanently attached to products, will often criticize the brand rather than the marketplace seller that sold the product.

29. Online product reviews significantly impact a brand's reputation. For instance, research has shown that 42% of online consumers now trust online reviews as much as personal recommendations from friends and family. *Online Reviews Statistics*, CAPITAL ONE SHOPPING RESEARCH (Jan. 27, 2026), https://capitaloneshopping.com/research/online-reviews-statistics/. Among consumers between eighteen and thirty-four years old, this share increases to 91%. *Id*. Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission ("FTC") has begun suing companies who post fake reviews of their products on online marketplaces. Megan Henney, *FTC cracking down on fake Amazon reviews*, FOX BUSINESS, (Feb. 28, 2019), https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC). The FTC has also released guidance to consumers on how to evaluate online reviews for authenticity. *See How to Evaluate Online Reviews*, FEDERAL TRADE COMMISSION CONSUMER ADVICE (Oct. 2022),

https://consumer.ftc.gov/articles/how-evaluate-online-reviews (warning consumers that some companies may provide incentives, such a free product, in exchange for writing a review).

30. Consumers are placing greater trust in negative online reviews of products than their positive counterparts. *See Fake Review Statistics*, CAPITAL ONE SHOPPING RESEARCH (last updated Sept. 10, 2025), https://capitaloneshopping.com/research/fake-review-statistics/ (estimating that an average of 30% of online reviews are considered fake or inauthentic and 82% of consumers will encounter these fake reviews at least once in a twelve-month period); Sofia Garcia Vargas, *From Trust to Doubt: Why Fake Online Reviews Still Fool Consumers*, UNIVERSITY OF SOUTH FLORIDA MUMA COLLEGE OF BUSINESS (June 4, 2024), https://www.usf.edu/business/news/2025/06-04-fake-online-reviews-study.aspx (explaining that participants in a series of studies were "substantially more likely" to trust negative reviews than positive reviews). According to one study, a single negative review on the first page of a product page reduced the likelihood of purchase by the consumer by 42%. Paulo Albuquerque, et al., *How Negative Reviews Affect Online Consumers*, INSEAD KNOWLEDGE (Nov. 9, 2023), https://knowledge.insead.edu/marketing/how-negative-reviews-affect-online-consumers. As a result, brands are especially harmed when consumers leave negative product reviews after purchasing from an unauthorized seller because the reviews will be widely viewed and deemed to be particularly accurate in describing a product's quality.

31. Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a brand owner's reputation and goodwill. Not only are consumers less likely to buy a product with negative reviews, websites like Amazon use algorithms to downgrade products it believes consumers are less likely to buy. Thus, poor reviews can create a downward spiral where downgraded search placement leads to reduced sales, which leads to further

downgraded product placement.

**Barr Brands Has Been the Target of Negative Online Marketplace Reviews from Customers Who Purchased Products from Unauthorized Sellers**

32. Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor-quality products and leave negative reviews on the product listing. These negative reviews injure consumer perceptions of the brand's quality and reputation, as well as its placement in search results, ultimately causing the brand to suffer damage to its goodwill and lost sales.

33. Barr Brands has been a victim of the issues caused by unauthorized sellers on online marketplaces. Numerous consumers who purchased Barr Brands products from unauthorized sellers, like Defendants, have written negative reviews where they complained of receiving products that were damaged, defective, previously used, counterfeit, or of otherwise poor quality.

34. As seen in the following screenshots, numerous consumers have left negative reviews complaining of receiving products that were old, opened, damaged, and missing necessary parts:



Texas BK

NOT GOOF-OFF. IT'S A DUD. 👎

Reviewed in the United States on April 11, 2026

Size: 8 Fl Oz (Pack of 1) | Verified Purchase

Not sure what this is but I know what it's NOT. This is Not Goof Off. I've used Goof Off for years with success but I've yet to find anything this can I was sent will work on. It will Not even remove light tape residue. It must just be water in this can because it's a dud. 👎

charlestongirl

★☆☆☆☆ **Only One**

Reviewed in the United States on April 5, 2026

Scent: Unscented | Size: 10.5 Oz | Verified Purchase

Listing is clearly for 3 items and I only received one. Will be returning.

One person found this helpful

Helpful | Report

Bambi Shelley

★☆☆☆☆ **Bad packaging.**

Reviewed in the United States on January 22, 2026

Verified Purchase

For the 3rd time in a row, the nozzle is broken. great product, but i have to keep pouring what solution is left in the bottle into the old bottle.

Helpful | Report

Penny R

★☆☆☆☆ **Leaked**

Reviewed in the United States on February 12, 2025

Size: 4 Fl Oz (Pack of 1) | Verified Purchase

The top was loose and leaked Thur the box lost a little over 1/4 of the small bottle

Helpful | Report

Nicole J. Hemphill

★☆☆☆☆ **Busted bottle**

Reviewed in the United States on November 18, 2024

Size: 8 Fl Oz (Pack of 1) | Verified Purchase

I ordered this stuff because it's good but when I finally opened my Amazon package, the bottle was open and the solution spilled out

Helpful | Report

Sharon

★☆☆☆☆ **The can was severely dented**

Reviewed in the United States on July 12, 2024

Verified Purchase

The can was seriously dented. There was a hole in the box, but it seemed to be packed ok but didn't seem bad enough for the can to be in the condition it was. We suspect that the can was damaged before it shipped.





Nelson A.

★☆☆☆☆ **Bottle came open**

Reviewed in the United States on October 23, 2023

Size: 4 Fl Oz (Pack of 1) | Verified Purchase

Bottle came opened inside package when I put my hand inside to take it out I noticed it was opened and spilled it burned my arm




Helpful | Report

Ria

**AMAZON SELLING OLD PRODUCT & DEFECTIVE**

Reviewed in the United States on March 22, 2023

Scent: Unscented | Size: 10.5 Oz | Verified Purchase

I have purchased these from stores & they all are in good condition.
The ones I purchased through Amazon were very old the silver top had tarnished to blackish & the white thin film that is supposed to stay on top after pulling back the silver top was disintegrated.
It wasn't even just stuck to the silver top/cover it wasn't even there any longer so I had to return. Will not order this product from Amazon again.

3 people found this helpful

Helpful | Report

35. The foregoing reviews are only a small sample of the negative reviews of Barr Brands products that have been posted on the Amazon platform.

36. Amazon does not allow product reviews to identify the seller that sold the product that is the subject of the product review. Given that G.P.S. is selling a high volume of products bearing the Barr Brands Trademarks on Amazon and is not subject to Barr Brands's quality controls, however, it is likely that some of the foregoing negative reviews—and the many similar reviews of Barr Brands products that appear on the Amazon website—were written by customers who purchased products bearing the Barr Brands Trademarks from Defendants.

**Barr Brands Has Implemented Quality Controls Throughout Its Authorized Channels of Distribution to Combat the Problems Presented By Online Marketplaces, Protect the Value of the Barr Brands Trademarks, and Ensure Customers Receive the Genuine, High Quality Products They Expect From Barr Brands**

37. The above reviews show how sales of poor-quality Barr Brands products disappoint Barr Brands's consumers and cause significant harm to the reputation and goodwill of Barr Brands. To protect itself and consumers from these harms, Barr Brands implemented a quality control program that applies to all of its Authorized Sellers, including sellers that sell in a brick-and-mortar retail setting and sellers that sell online.

38. Barr Brands's distribution controls are a quality control measure intended to minimize the risk and reputational damage caused by the illegal sale of poor-quality products bearing the Barr Brands Trademarks by unauthorized sellers like G.P.S. who do not abide by Barr Brands's quality controls. The goal of Barr Brands's quality control program is to ensure that

consumers who buy Barr Brands products, including ones buying online, receive the high-quality products and services that they expect with the Barr Brands name. By preventing consumers from receiving poor-quality products, the program both protects consumers from confusion and also protects the value and goodwill associated with the Barr Brands brands.

39. Barr Brands abides by its quality control requirements and requires its Authorized Sellers to abide by them as well.

40. Barr Brands's ability to exercise its quality controls is essential to the integrity and quality of Barr Brands products, as well as the value of the Barr Brands Trademarks and other intellectual property.

41. The Barr Brands Rules limit to whom and where Authorized Sellers may sell Barr Brands products. To prevent persons outside of Barr Brands's quality controls from acquiring and reselling Barr Brands products, the Barr Brands Rules prohibit Authorized Sellers from selling Barr Brands products to any third party who is not an Authorized Seller and who intends to resell the products. Authorized Sellers are permitted to sell Barr Brands products only to end-user consumers or, in certain circumstances, to other Authorized Sellers.

42. These restrictions are essential to Barr Brands's ability to exercise its quality controls over Barr Brands products because they prevent unauthorized sellers from obtaining and reselling Barr Brands Products and allow Barr Brands to know where all of its products are being sold online by Authorized Sellers. If a quality issue arises through an online sale, Barr Brands can identify the Authorized Seller that made the sale, contact the Authorized Seller, and address the issue immediately. Barr Brands is unable to take such action against unauthorized sellers because it does not know who those sellers are and cannot obtain their cooperation in addressing any product quality issues that may arise.

43. In addition to restricting where and how Authorized Sellers can sell Barr Brands Products, the Barr Brands Rules also require Authorized Sellers to follow numerous quality control requirements related to the inspection, handling, storage, and shipment of Barr Brands products.

44. Authorized Sellers are also prohibited from tampering with, defacing, or otherwise altering any identifying information on Barr Brands products, including any serial number, UPC code, or other identifying information.

45. Barr Brands's quality control and customer service requirements are legitimate and substantial and have been implemented so that Barr Brands can control the quality of goods manufactured and sold under the Barr Brands Trademarks, to protect consumers as well as the value and goodwill associated with the Barr Brands Trademarks.

46. Barr Brands's quality control and customer service requirements are also material, as they are designed to protect consumers and prevent them from receiving poor quality and unsafe products. Consumers would find it material and relevant to their purchasing decision to know whether a Barr Brands product that they were considering buying was being sold by an Authorized Seller who is subject to Barr Brands's quality control and customer service requirements or whether the product is being sold by an unauthorized seller who is not subject to, and does not abide by, Barr Brands's quality controls and over whom Barr Brands is unable to exercise its quality controls.

**Given the Flood of Poor Quality Products Being Sold Online and Consumers' Inability to Inspect Such Products Before Purchase, Barr Brands Imposes Additional Requirements on Its Authorized Sellers Who Sell Online**

47. As shown in consumer reviews cited above, *supra* ¶ 35, Barr Brands products sold online are more susceptible to quality and authenticity problems as consumers cannot see the product before they buy it. These problems are especially severe on online marketplaces such as

Amazon, eBay, and Walmart, where sellers can conceal the fact that they are an unauthorized seller and many sellers may share a single product listing page.

48. Given these heightened risks to consumer satisfaction and the value of its trademarks that are posed by online sellers, Barr Brands imposes additional quality control requirements on all of its Authorized Sellers who sell Barr Brands products online.

49. For example, Authorized Online Sellers must use images of Barr Brands products provided or approved by Barr Brands and keep product descriptions up to date; prohibit Authorized Online Sellers from selling anonymously; and prohibit Authorized Online Sellers from representing or advertising any Barr Brands product as "new" that has been returned, repackaged, or otherwise been altered by a customer, among other requirements.

50. In light of the unique quality-control challenges presented by online marketplaces like Amazon, and to further Barr Brands's efforts and ability to assure product quality and adherence to Barr Brands's quality control standards, protect the value and goodwill associated with the Barr Brands Trademarks, and prevent consumer confusion, Barr Brands has approved limited Authorized Sellers to sell on the Amazon marketplace ("Authorized Amazon Seller"). This limitation also helps prevent the confusion that exists when consumers are presented with many Amazon marketplace sellers and are unable to discern which are authorized and subject to Barr Brands's quality controls.

51. Barr Brands's Authorized Amazon Sellers are vetted by Barr Brands to ensure that they meet Barr Brands's criteria and will properly represent Barr Brands and are subject to heightened reporting requirements to Barr Brands.

52. The additional quality control requirements that Barr Brands imposes on its Authorized Sellers are legitimate and substantial and have been implemented to allow Barr Brands

to carefully control the quality of Barr Brands products that are sold online and quickly address any quality issues that arise.

53. Barr Brands's additional quality controls are also material, as they have been implemented to ensure that consumers purchasing Barr Brands products online receive genuine, high-quality Barr Brands products that abide by Barr Brands's quality controls. Consumers purchasing Barr Brands products online would find it relevant to their purchasing decision to know whether the product they are buying is vended by an Authorized Online Seller who is subject to, and abides by, Barr Brands's quality controls.

**Genuine Barr Brands Products Come with Barr Brands's Satisfaction Guarantees**

54. Barr Brands automotive products purchased from Barr Brands or Barr Brands's Authorized Sellers come with Barr Brands's Satisfaction Guarantee (the "Barr Brands Guarantee").

55. The Barr Brands Guarantee allows customers to request a refund if they are not satisfied with a Barr Brands automotive product purchased from an authorized seller within 45 days of the purchase date. The complete Barr Brands Guarantee statement can be viewed online at https://goofoffproducts.com/wp-content/uploads/sites/5/2024/05/Satisfaction-Guarantee-Language-For-Automotive-Products.pdf?utm_source=chatgpt.com and is incorporated herein.

56. As discussed above, Barr Brands cannot ensure the quality of the products sold by unauthorized sellers, like Defendants, who are not subject to Barr Brands's quality controls. For this reason, the Barr Brands Guarantee does not cover Barr Brands products sold by unauthorized sellers, like Defendants, who do not comply with Barr Brands's quality controls and standards.

57. The Barr Brands Guarantee is a material component of genuine Barr Brands products. Consumers who purchase Barr Brands products with the Barr Brands Guarantee receive

the peace of mind that they are receiving a good quality product, that Barr Brands stands behind the product, and that if a defect occurs, they will have the ability to request a refund.

58. Consumers would find it material and relevant to their purchasing decision to know whether a Barr Brands product they were considering buying was covered by the Barr Brands Guarantee. If a consumer knew a product did not come with the Barr Brands Guarantee, the consumer would be less likely to purchase the product.

**G.P.S. sells products bearing the W M Barr trademarks**

59. G.P.S. is not an Authorized Seller and has not received Barr Brands's written consent to sell Barr Brands products through the G.P.S. Storefronts.

60. G.P.S. has advertised, offered for sale, and sold products bearing one or more of the Barr Brands Trademarks through its Amazon storefront "G.P.S."

61. G.P.S. also uses the eBay storefront "g.p.s.llc" to advertise and sell products bearing the Barr Brands Trademarks.

62. G.P.S. also uses the Walmart storefront associated with seller ID 16256 to advertise and sell products bearing the Barr Brands Trademarks.

63. G.P.S. uses the Barr Brands Trademarks in connection with those offers and sales, including by offering products whose packaging bears the marks and by identifying those products with the marks in its marketplace offers. Upon information and belief, G.P.S. sells and ships products to customers in interstate commerce.

64. Upon information and belief, G.P.S.'s infringing sales do not clearly disclose that G.P.S.'s products are outside Barr Brands's controlled distribution system or, for products covered by the Guarantee, that purchases from G.P.S. are ineligible for the Guarantee.

65. Customers encountering G.P.S.'s offers see the same Barr Brands Trademarks that appear on products sold through authorized channels. They are likely to believe that the products carry the quality assurances and applicable manufacturer benefits ordinarily associated with those marks.

**G.P.S. Is Infringing the Barr Brands Trademarks by Selling Products Bearing the Barr Brands Trademarks That Are Not Subject to, Do Not Abide by, and Interfere with Barr Brands's Quality Control and Customer Service Requirements**

66. G.P.S. is not a participant in Barr Brands's authorized distribution system and is not subject to the Barr Brands Terms governing shipping, storage, handling, disposal, notification of quality issues, and assistance with recalls and safety communications.

67. Upon information and belief, G.P.S. has obtained and distributed the infringing products outside the monitored distribution chain described above. G.P.S. has not disclosed its sources to Barr Brands, and Barr Brands cannot trace and verify G.P.S.'s handling of those products through its authorized distribution records.

68. Upon information and belief, G.P.S. does not perform the required quality-control reporting and recall-assistance functions. Its distribution of the infringing products bypasses and interferes with Barr Brands's quality controls.

69. As a result, Barr Brands cannot provide purchasers from G.P.S. the same assurance that the products have remained subject to its controls throughout distribution or obtain G.P.S.'s required cooperation with quality investigations and safety communications.

70. The absence of those controls increases the risk of an unsatisfactory product experience and impairs Barr Brands's ability to investigate and correct quality issues. Consumers are likely to attribute a resulting negative experience to Barr Brands because G.P.S.'s products bear the Barr Brands Trademarks.

71. G.P.S.'s sale of products outside and in interference with these controls deprives Barr Brands of control over the quality associated with its marks. For trademark purposes, the infringing products are not equivalent to genuine Barr Brands products distributed under those controls.

72. Customers have written reviews of G.P.S.'s Amazon Storefront in which they complained of exceptionally poor service from G.P.S. and of receiving damaged or defective products[4]:

★☆☆☆☆ "Only sent 6 quarts instead of 7 as described"

By Capt. B on November 9, 2026.

★★☆☆☆ "Listing says 7 qts, but I only received 6. Ordered this one specifically because I need 7"

By Sidney C. on November 6, 2026.

★☆☆☆☆ "DO NOT BUY FROM THIS COMPANY G.P.S. if product is damaged you have to climb walls to try and get either replacement, or refund. * customer service. Find another seller, or better yet another product."

Read less

By Barry P. on October 26, 2026.

★☆☆☆☆ "Spray nozzle extension missing"

By Amazon Customer on October 18, 2026.

[4] Although Amazon has "struck-through" and added comments to some of these complaints stating that Amazon takes "responsibility" for the "fulfillment experiences" described in the complaints, the problems that consumers address in these reviews are clearly the fault of G.P.S. rather than a fulfillment problem, such as delivering a product to the wrong address, that could be attributable to Amazon rather than G.P.S.

"~~Item I had received in past, has a cap and push button, the one I received does not have cap and a much larger push button. Also two of the push buttons are disconnected from the can making them unusable~~"

Read less

By John leighton on October 14, 2026.

"~~Came beat up~~"

By Jesus Alatorre on October 1, 2026.

"~~All 3 can damaged due to poor packaging~~"

By Patrick j Durocher on October 5, 2026.

"~~Three of the bottles leaked out there contents!!!~~"

By Frederick A. Lovejoy on October 6, 2026.

"~~The tops of all four cans are damaged due to improper packaging.~~"

By Amie Edwards on September 30, 2026.

"~~I ordered (3) 6pck and received only (2) 6pck~~"

By Nathan on September 24, 2026.

"~~Very disapointed Item was shipped with NO cap. When I upen the box I could smell the spay. I have no idea how much spray was lost because of this.~~"

By Travler_02 on September 17, 2026.

"~~Was previously used by someone and sold to me as 'new'~~"

By Me on August 30, 2026.

73. G.P.S. has similarly negative reviews on its eBay and Walmart Storefronts.

74. Not only is G.P.S. selling poor-quality product and delivering poor customer service, Barr Brands conducted test purchases that show that G.P.S. is shipping the product in contravention of state and federal regulations.

75. For example, Barr Brands conducted a test purchase of the following product[5] sold by G.P.S. on its Amazon Storefront.




76. According to USPS Publication 52 (*see* https://pe.usps.com/text/pub52/welcome.htm), flammable liquids with a stated flash point of approximately 32°F, such as the Klean-Strip Bulldog Adhesion Promoter product, require the following per United States Postal Service ("USPS") Packaging Instruction 3A (*see https://pe.usps.com/text/pub52/pub52apxc_010.html*).

- A metal primary receptacle no larger than one quart;
- Enough cushioning to prevent breakage and absorb potential leakage;
- A securely sealed secondary package;

[5]Available at: https://www.amazon.com/dp/B0015DMJZ0.

- A strong outer package; and
- The Department of Transportation limited-quantity surface mark. *See* 49 CFR 172.315(a).

77. However, the Klean-Strip Bulldog Adhesion Promoter - 1 Quart product received from G.P.S. was improperly packaged. Specifically, there was no effective cushioning and no sealed secondary packaging. Instead, the product was sent in a cardboard Amazon box with a small amount of paper filler:






78. USPS also requires the mailer to identify the package as hazardous material when generating the label, use the appropriate hazardous-material Service Type Code and Extra Service Code, and transmit the required electronic shipping data. G.P.S. did not follow these requirements, in contravention of federal law and regulations.

79. In addition to USPS shipping restrictions, recent amendments to Colorado Air Quality Control Commission Regulation No. 25 establish new volatile organic compound

("VOC") limits for specific product categories, including adhesion promoters, effective May 1, 2026. As a result, the Klean-Strip Bulldog Adhesion Promoter - 1 Quart product no longer complies with the VOC requirements for sale or use in the State of Colorado. Nonetheless, G.P.S. shipped this product into Colorado in August 2026 in response to Barr Brands's test purchase[6]:







80. Although this test purchase did contain the "limited quantity" mark on the exterior packaging, it was missing the effective cushioning and sealed secondary packaging and should not have been shipped into the State of Colorado.

**G.P.S. Is Infringing the Barr Brands Trademarks by Selling Products Bearing the Barr Brands Trademarks That Do Not Come with the Barr Brands Guarantee**

81. Because G.P.S. is not an Authorized Seller, purchases of covered products from G.P.S. do not qualify for the Guarantee under the applicable terms, except where otherwise required by law.

---

[6] The name, street number, and street name of the address have been redacted, however, the 80206 zip code and visible "Denver, CO" city and state show that the product was delivered to an address within the State of Colorado.

82. For the G.P.S. products identified above that would qualify if purchased from an Authorized Seller, the absence of the Guarantee is a material difference from the products offered through authorized channels.

83. A marketplace refund, return policy, or remedy G.P.S. may independently provide does not give the purchaser eligibility for Barr Brands's Guarantee. Consumers who rely on the Barr Brands Trademarks may therefore purchase G.P.S.'s products believing they receive a manufacturer-backed benefit that is unavailable to them.

84. These material differences and interference with quality controls make G.P.S.'s challenged trademark uses likely to confuse consumers about the quality, approval, and benefits of the products offered. Barr Brands's claims arise from those differences and interference, rather than merely from G.P.S.'s lack of authorization to resell.

**G.P.S. is Tortiously Interfering with**
**Barr Brands's Agreements and Business Relationships with Its Authorized Retailers**

85. As discussed, Barr Brands allows Barr Brands Products to be sold to end user consumers only by Barr Brands itself and Authorized Retailers.

86. The Barr Brands Rules prohibit Authorized Retailers from selling Barr Brands Products to unauthorized resellers who intend to resell the products.

87. G.P.S. has sold and is continuing to sell a high volume of products bearing the Barr Brands Trademarks on the Internet. Barr Brands has not itself knowingly sold any Barr Brands Products to GP.S. and, through investigation, has learned that G.P.S. is obtaining the volume of products it sold through one or more Authorized Retailers. These purchases from Authorized Retailers are made with the purpose of reselling them on the Internet.

88. G.P.S. has known that Barr Brands's contracts with its Authorized Retailers prohibit Authorized Retailers from selling products to unauthorized sellers, such as G.P.S., who intends to resell the products.

89. G.P.S. has known of this prohibition since at least approximately February 2026. On February 6, 2026, Barr Brands, through counsel, sent G.P.S. a cease-and-desist letter by overnight delivery and email, addressed to Genuine Products Supply, LLC, care of Moses Kohn and Blima Kohn, at the two Monroe addresses identified above and at G.P.S.llc0@yahoo.com.

90. The February 6 letter identified G.P.S. as the operator of the Amazon storefront "G.P.S." and explained Barr Brands's trademark rights, quality controls, satisfaction guarantee, and distribution restrictions. It demanded that G.P.S. cease sales, remove Barr Brands product listings, and identify its sources by February 13, 2026.

91. G.P.S. failed to comply with those demands.

92. On February 23, 2026, Barr Brands's counsel sent G.P.S. a further letter by overnight delivery and email at the same addresses. That letter identified G.P.S. as the operator of both "G.P.S." on Amazon and "g.p.s.llc" on eBay, reiterated Barr Brands's demands, and notified G.P.S. of reasonably anticipated litigation and its obligation to preserve relevant records.

93. The February 23 letter requested preservation of records concerning sourcing, sales, customer communications, product and seller reviews, finances, and shipments, and requested confirmation of compliance by March 2, 2026.

94. As a final attempt to avoid litigation, the cease and desist letter was sent to the Bloomingburg, NY address on October 28, 2026. Again, G.P.S. failed to respond.

95. Barr Brands's letters also informed Defendants that, by purchasing Barr Brands Products from an Authorized Seller for purposes of resale, they were causing a breach of the

agreements between Barr Brands and its Authorized Retailers and interfering with Barr Brands's agreements and business relationships.

96. Defendants were also advised that if they continued to acquire Barr Brands Products from Barr Brands's Authorized Retailers for purposes of resale, they would be liable for tortiously interfering with Barr Brands's contracts and/or business relationships.

97. Despite being provided with this information, G.P.S., upon information and belief, has continued to acquire Barr Brands Products from Authorized Retailers for resale and has intentionally, knowingly, and willfully interfered with Barr Brands's agreements with its Authorized Retailers by inducing Authorized Retailers to breach their agreements and sell products to G.P.S. that G.P.S. resold on the Internet.

98. In interfering with Barr Brands's agreements, G.P.S. acted without justification and with a wrongful purpose. G.P.S. purchased Barr Brands Products from Authorized Retailers—and in so doing, instigated a breach of Authorized Retailers' agreements with Barr Brands—so that G.P.S. could unlawfully infringe upon and materially damage the value of the Barr Brands Trademarks by reselling the products on the Internet, thereby committing an independent tort.

99. G.P.S. is not party to the agreements it caused Authorized Retailers to breach.

**Barr Brands Has Suffered Substantial Harm as a Result of G.P.S.'s Conduct**

100. As set forth above, the unauthorized sale of products bearing the Barr Brands Trademarks by unauthorized sellers such as G.P.S. have caused significant harm to the Barr Brands brand.

101. When a consumer receives a non-genuine, damaged, or poor-quality product from an unauthorized seller, such as G.P.S., the consumer associates that negative experience with Barr

Brands. As such, G.P.S.'s ongoing sale of non-genuine products bearing the Barr Brands Trademarks harms Barr Brands and its brands.

102. Barr Brands has suffered, and will continue to suffer, significant monetary harm as a result of G.P.S.'s actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

103. Barr Brands has suffered, and will continue to suffer, irreparable harm as a result of G.P.S.'s actions, including, but not limited to, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights, and brand integrity.

104. Barr Brands is entitled to injunctive relief because, unless enjoined by this Court, G.P.S. will continue to unlawfully sell materially different products bearing the Barr Brands Trademarks, causing continued irreparable harm to Barr Brands's reputation, goodwill, relationships, intellectual property, and brand integrity.

105. Additionally, Barr Brands is entitled to injunctive relief requiring G.P.S. to return or destroy infringing products because without that remedy, G.P.S. may evade injunctive relief by transferring their infringing products to another reseller.

106. G.P.S.'s conduct was and is knowing, reckless, intentional, willful, malicious, wanton, and contrary to law.

107. G.P.S.'s willful violations of the Barr Brands Trademarks and continued pattern of misconduct demonstrate intent to harm Barr Brands.

## FIRST CAUSE OF ACTION
**Trademark Infringement**
**15 U.S.C. §§ 1114 and 1125(a)(1)(A)**

108. Barr Brands hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

109. Barr Brands is the owner of the Barr Brands Trademarks.

110. Barr Brands has registered the Barr Brands Trademarks with the United States Patent and Trademark Office.

111. The Barr Brands Trademarks are valid and subsisting trademarks in full force and effect.

112. G.P.S. willfully and knowingly used, and continue to use, the Barr Brands Trademarks in interstate commerce for purposes of selling non-genuine products bearing the Barr Brands Trademarks on the Internet without Barr Brands's consent.

113. The products G.P.S. sells bearing the Barr Brands Trademarks are not authorized for sale by Barr Brands.

114. The products G.P.S. sell bearing the Barr Brands Trademarks are materially different from genuine Barr Brands products because they are not subject to, do not abide by, and interfere with the legitimate and substantial quality controls that Barr Brands has established.

115. The products G.P.S. sells bearing the Barr Brands Trademarks are also materially different from genuine Barr Brands products because they do not come with the Barr Brands Guarantee, which accompanies genuine Barr Brands products.

116. G.P.S.'s unauthorized sale of materially different products bearing the Barr Brands Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products G.P.S. offers for sale are genuine Barr Brands products when they are not.

117. G.P.S.'s unauthorized sale of materially different products bearing the Barr Brands Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products G.P.S. offers for sale are sponsored, authorized, or otherwise connected with Barr Brands when, in fact, they are not.

118. G.P.S.'s unauthorized use of the Barr Brands Trademarks has infringed upon and materially damaged the value of the Barr Brands Trademarks and caused significant damage to Barr Brands's business relationships.

119. As a proximate result of G.P.S.'s actions, Barr Brands has suffered, and will continue to suffer immediate and irreparable harm. Barr Brands has also suffered, and continues to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

120. Barr Brands is entitled to recover its damages caused by G.P.S.'s infringement of the Barr Brands Trademarks and disgorge G.P.S.'s profits from their willfully infringing sales and unjust enrichment.

121. Barr Brands is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for G.P.S.'s infringement and unless G.P.S. is permanently enjoined, Barr Brands will suffer irreparable harm.

122. Barr Brands is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Barr Brands Trademarks.

## SECOND CAUSE OF ACTION
**Unfair Competition**
**15 U.S.C. § 1125(a)**

123. Barr Brands hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

124. As set forth above, G.P.S. is selling non-genuine products bearing the Barr Brands Trademarks that are materially different from genuine Barr Brands products.

125. G.P.S.'s sale of non-genuine products bearing the Barr Brands Trademarks is likely to cause consumer confusion and lead consumers to believe that those products are affiliated with, connected with, associated with, sponsored by, or approved by Barr Brands when they are not.

126. G.P.S.'s conduct constitutes unfair competition under the Lanham Act, 15 U.S.C. § 1125(a).

127. Barr Brands is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for G.P.S.'s infringement and unless G.P.S. is permanently enjoined, Barr Brands will suffer irreparable harm.

128. Barr Brands is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Barr Brands Trademarks.

## THIRD CAUSE OF ACTION
**Tortious Interference with Contracts and Business Relationships Under Tennessee Common Law**

129. Barr Brands hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

130. Barr Brands has contracts and business relationships with its Authorized Sellers, who sell Barr Brands products. These contracts prohibit Authorized Sellers from selling Barr Brands products to third parties, such as G.P.S., who are not Authorized Sellers and who intend to resell the products.

131. G.P.S. is not an Authorized Seller of Barr Brands products.

132. G.P.S. has sold—and continue to sell—products bearing the Barr Brands Trademarks through Storefronts.

133. Barr Brands has not itself sold any Barr Brands products to Defendants.

134. Upon information and belief, Defendants acquired the products they are reselling from one or more of Barr Brands's Authorized Sellers.

135. G.P.S. has known since (at the latest) receiving Barr Brands's cease-and-desist letter that Barr Brands has agreements with all of its Authorized Sellers that prohibit them from selling to non-Authorized Sellers who intend to resell products, and that G.P.S. would tortiously interfere with those agreements if they continued to acquire products from Authorized Sellers for resale.

136. G.P.S., without legal right, privilege, or justification, has intentionally, knowingly, and willfully interfered with the contracts and business relationships between Barr Brands and its Authorized Sellers by purchasing products from Authorized Sellers for the purpose of reselling them on the Internet, thereby causing Authorized Sellers to breach their contracts with Barr Brands.

137. In inducing Barr Brands's Authorized Sellers to breach their contracts with Barr Brands, G.P.S. acted with a wrongful purpose—specifically, to unlawfully infringe upon and materially damage the value of the Barr Brands Trademarks by reselling the products they obtained from Authorized Sellers in violation of their contracts.

138. Upon information and belief, G.P.S. also interfered with Barr Brands's contracts with its Authorized Sellers through wrongful means, namely concealing and failing to disclose their intention to resell the products even after being informed that this intention would mean that Authorized Sellers would be breaching their agreements with Barr Brands by selling to G.P.S.

139. Because G.P.S. has refused to disclose how they have obtained the products bearing the Barr Brands Trademarks they have resold, Barr Brands must take discovery in this action to learn the specific identities of the Authorized Sellers that sold products to G.P.S. G.P.S., however,

knows the sources of the Barr Brands products it has obtained and the basis for Barr Brands's claim of tortious interference. Barr Brands's agreements with its Authorized Sellers are a specific class of contract that G.P.S. caused Authorized Sellers to breach when it purchased products from Authorized Sellers for resale.

140. G.P.S.'s actions have caused Barr Brands to suffer, and continue to suffer, substantial injury including loss of sales and damage to its existing and potential business relations.

141. The injury to Barr Brands is immediate and irreparable, as Barr Brands's reputation and relationships have been damaged among both its consumers and Authorized Sellers.

142. Barr Brands is also entitled to punitive damages because G.P.S. acted with actual malice and accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

**FOURTH CAUSE OF ACTION**
**Inducement to Breach a Contract**
**Tenn. Code § 47-50-109**

143. Barr Brands hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

144. Barr Brands has contracts and business relationships with its Authorized Sellers, who sell Barr Brands products. These contracts prohibit Authorized Sellers from selling Barr Brands products to third parties, such as G.P.S., who are not Authorized Sellers and who intend to resell the products.

145. G.P.S. is not an Authorized Seller of Barr Brands products.

146. G.P.S. has sold—and continue to sell—products bearing the Barr Brands Trademarks through Storefronts.

147. Barr Brands has not itself sold any Barr Brands products to Defendants.

148. Upon information and belief, Defendants acquired the products they are reselling from one or more of Barr Brands's Authorized Sellers.

149. G.P.S. has known since (at the latest) receiving Barr Brands's cease-and-desist letter that Barr Brands has agreements with all of its Authorized Sellers that prohibit them from selling to non-Authorized Sellers who intend to resell products, and that G.P.S. would tortiously interfere with those agreements if they continued to acquire products from Authorized Sellers for resale.

150. G.P.S., without legal right, privilege, or justification, has intentionally, knowingly, and willfully induced breaches of contracts between Barr Brands and its Authorized Sellers by purchasing products from Authorized Sellers for the purpose of reselling them on the Internet.

151. Upon information and belief, G.P.S. concealed and failed to disclose their intention to resell the products even after being informed that this intention would mean that Authorized Sellers would be breaching their agreements with Barr Brands by selling to G.P.S.

152. G.P.S.'s conduct induced Bar Brands's Authorized Sellers to breach their contracts in violation of Tenn. Code § 47-50-109.

153. Because G.P.S. has refused to disclose how they have obtained the products bearing the Barr Brands Trademarks they have resold, Barr Brands must take discovery in this action to learn the specific identities of the Authorized Sellers that sold products to G.P.S. G.P.S., however, knows the sources of the Barr Brands products it has obtained and the basis for Barr Brands's claim of tortious interference. Barr Brands's agreements with its Authorized Sellers are a specific class of contract that G.P.S. caused Authorized Sellers to breach when it purchased products from Authorized Sellers for resale.

154. G.P.S.'s actions have caused Barr Brands to suffer, and continue to suffer, substantial injury including loss of sales and damage to its existing and potential business relations.

155. The injury to Barr Brands is immediate and irreparable, as Barr Brands's reputation and relationships have been damaged among both its consumers and Authorized Sellers.

156. Barr Brands is also entitled to treble damages under Tenn. Code § 47-50-109.

## PRAYER FOR RELIEF

WHEREFORE, Barr Brands prays for relief and judgment as follows:

A. Judgment in favor of Barr Brands and against G.P.S. in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, liquidated damages, restitution, including disgorgement of profits, and pre-judgment and post-judgment interest, as permitted by law;

B. Preliminary and permanent injunctions enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

i) Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all products bearing the Barr Brands Trademarks;

ii) Prohibiting the Enjoined Parties from using any of the Barr Brands Trademarks in any manner, including advertising on the Internet;

iii) Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all products bearing any of the Barr Brands Trademarks;

iv) Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Barr Brands Trademarks including invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that G.P.S. has sold bearing these trademarks;

v) Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of Barr Brands's products, or any of the Barr Brands Trademarks;

vi) Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo, and Bing), to remove from the Internet any of the Barr Brands Trademarks which associate Barr Brands's products or the Barr Brands Trademarks with the Enjoined Parties or the Enjoined Parties' websites; and

vii) Requiring the Enjoined Parties to take all action to remove the Barr Brands Trademarks from the Internet, including from Amazon, eBay, and Walmart;

viii) Requiring G.P.S. to lawfully destroy or return to Barr Brands all products bearing the Barr Brands Trademarks in G.P.S.'s control;

C. An Order requiring Amazon.com, Inc., Wal-Mart.com USA, LLC, Walmart Inc., and eBay Inc. to freeze all funds in any accounts owner or controlled by G.P.S.;

D. An award of attorneys' fees, costs, and expenses; and

E. Such other and further relief as the Court deems just, equitable and proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Barr Brands demands trial by jury on all issues so triable.

Dated: November 17, 2026

Respectfully submitted,

*/s/ Nelson T. Rainey*

Nelson T. Rainey (TN #35470)
SEGAL MCCAMBRIDGE SINGER & MAHONEY, Ltd.
5100 Poplar Avenue, Suite 1212
Memphis, TN 38137
Telephone: (901) 415-1160
Email: nrainey@smsm.com
*Attorneys for Plaintiff*